IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-06-89-7 |
| | § | CIVIL ACTION NO. H-09-4049 |
| JESUS ALEJANDRO OSORIO, | § | |
| | § | |
| Defendant-Movant | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28

U.S.C. § 2255 is Movant Jesus Alejandro Osorio's § 2255 Motion to Vacate, Set Aside or

Correct Sentence (Document No. 480),[1] Declaration In Support (Document No. 481),

Memorandum in Support (Document No. 487), Motion to Supplement Evidence Testimonial to

§ 2255 Motion (Document No. 503),[2] and the United States' Answer and Motion to Dismiss

(Document No. 504). After reviewing Movant's § 2255 Motion, his Declaration, Memorandum

in Support, Motion to Supplement Evidence Testimonial, the Government's Answer and Motion

to Dismiss, the record of the proceedings before the District Court in the underlying criminal

case, and the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set

---

[1] Jesus Alejandro Osorio's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-09-4049 and at Document No. 480 in Criminal Action No. H-06-89. References hereafter will be to the Criminal Document numbers unless otherwise indicated.

[2] Movant has submitted the affidavit of German Arias. The Affidavit is in Spanish. Arias testified at trial pursuant to a plea agreement he had entered with the Government. The Affidavit pertains to the role of two other co-defendants, Eric Vasquez and Sugentino Percel. Because the Affidavit does not mention Osorio or his role in the offense, his Motion to Supplement Evidence Testimonial (Document No. 503) is DENIED.

forth below, that the Government's Motion to Dismiss (Document No. 504) be Granted, and that

Movant Osorio's § 2255 Motion (Document No. 504) be DENIED.

## I.      Procedural History

Movant Jesus Alejandro Osorio ("Osorio"), who is currently in the custody of the United

States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C.§ 2255. This is

Osorio's first attempt at § 2255 relief.

On March 21, 2006, Osorio, along with Juan A. Escobar, Leon Baldomero DeLeon,

Sugentino Percel, Eric Vasquez, Leonardo Arcemio Garcia, Bonifacio Hernandez, and German

Arias, was charged by Indictment with drug trafficking activities. In particular, Osorio was

charged with conspiracy to possess with intent to distribute 5 kilograms or more of cocaine in

violation of 21 U.S.C. §§ 846, 841(a)(1) & 841(b)(1)(A)(ii) (Count one), and possession with

intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) &

841(b)(1)(A)(ii), and 18 U.S.C. § 2 (Count two). (Document No. 22) Prior to trial, counsel

filed a Motion to Suppress Evidence (Document No. 126)[3], and Motion to Sever (Document No.

---

[3] Counsel argued that Osorio's Fourth, Fifth and Sixth Amendment rights were violated. Specifically, counsel argued:

A. There was no justification for Defendant's detention; the detaining officer did not have specific articulable facts to lead him to conclude that Defendant was, had been, or soon would be engaged in criminal activity.

B. There was no probable cause for Defendant's arrest. Thus, the arrest was unlawful, and any search and seizure made incident to the arrest was likewise unlawful.

C. The search and seizure were beyond the permissible scope of a warrantless search and seizure incident to even a valid arrest.

127).  A Suppression Hearing was held on November 14, 2006.  (Document No.  172, Transcript

of Suppression Hearing, (Document No.  384).  Judge Harmon denied both motions.  (Document

No.  173).   In denying the Motion to Suppress, Judge Harmon wrote:

> Osorio challenges the initial search of the vehicle in which he was a passenger, the
> search of his residence, and the admissibility of the statement [that] he made to
> authorities after his arrest.  Osorio argues that his mere presence in a vehicle
> containing hidden drugs does not give probable cause to arrest him.  Morever, he
> claims that the canine alert to the drugs within the vehicle was indefinite and did
> not provide probable cause.  The witnesses for the government, who had been
> engaged in a day long surveillance of the activities of Osorio and his co-
> defendants, established that there was probable cause to believe that Osorio was
> participating in an alleged drug trafficking operation.  The initial traffic stop of the
> vehicle for a speeding violation and an expired registration was legal.  When the
> canine alerted to the drugs, the agents obtained the consent of the driver of the
> vehicle to search it, and the agents found drugs hidden in it.  The search of
> Osorio's apartment was done with his full voluntary consent.  The statement
> Osorio gave the agents was given after he was apprised of his Miranda rights in
> both English and Spanish and waived those rights in writing.

Following a four-day trial, Osorio was found guilty on both counts on November 20, 2006.

(Document No.  192).

Prior to sentencing, a pre-sentence investigation report ("PSR")  was prepared to which

---

D.  Defendant was not Mirandized upon his detention, arrest, and/or interrogation.

E.  Defendant did not intentionally, knowingly, intelligently, and/or voluntarily
waive any of his rights, including without limitation waiving any of his Miranda
rights.

F.  Defendant was coerced, threatened, intimidated, and/or placed under extreme
duress by the State's agents or actors into speaking with the State's agents or
actors and giving a statement.

G.  Defendant's statements, either spoken or written, were obtained in violation of
the provisions set forth above and their suppression is requested pursuant to
respective federal laws and constitutional provisions.

Osorio filed written objections.[4]  (Document Nos.  273, 292, 294).  With respect to the Offense

Conduct, and in particular, Osorio's role, the PSR states in pertinent part:

> 5.  On February 21, 2006, at approximately 10:00 a.m. information was received
> by officers of the Pasadena Police Department that a known narcotics trafficker
> was to meet with another subject at Bravo's Mexican Restaurant, 10906 Fuqua,
> Houston, Texas.

> 6.  At approximately 10:45 a.m., surveillance was established in the parking lot of
> Bravo's Mexican Restaurant by members of the Pasadena Narcotics Unit along
> with DEA agents.

> 7.  At approximately 11:05 a.m., a gray Jeep Cherokee, Texas License #F36-DBH,
> was seen arriving and backed into a parking space with the rear of the vehicle
> facing towards Bingle.  The vehicle was occupied by a Hispanic male driver, (later
> identified as Bonifacio Hernandez), a Hispanic female passenger, and a young
> Hispanic male passenger in the back seat (approximately 4-6 years old).  The
> vehicle and its occupants stayed in the parking lot as if waiting for someone else
> to arrive.

> 8.  At approximately 11:11 a.m., a black GMC Yukon Denali, TXLP# 7GK-M52
> was seen arriving and also backed into a parking space with the rear of the vehicle
> facing towards Bingle.  The GMC parked three spaces away from the gray Jeep
> Cherokee.  The GMC was occupied by two Hispanic males, (later identified as
> Juan Escobar (driver) and Leon Baldomero DeLeon).

> 9.  As Escobar and DeLeon exited their vehicle, Hernandez exited his vehicle as
> well.  All three males met in the center of the parking lot and walked to the
> entrance of the restaurant and went inside.

> 10.  A check of the two vehicles registrations by agents revealed that the Jeep was
> a 1999 Jeep registered to a Sergio Guadiana at 4022 Courtney, Houston, Texas.
> The GMC was registered as a 2002 GMC Yukon to a Maria G.  Lucio at 7622
> Lemma Dr., Houston, Texas.

> 11. At 11:38 a.m., all three of the males emerged from the restaurant and got into
> their respective vehicles and left the area.  The Jeep went west bound on Bingle
> and then south bound onto the feeder of SH 290.

---

[4] Osorio objected to PSR ¶ 53, which assessed a total offense level of 34.  According to
Osorio, because he had a minor or minimal role in the drug trafficking activities pursuant to
U.S.S.G. § 3B1.2(a) or (b), his offense level should have been adjusted downward.

4

12.  The black GMC left in the same direction, but went north bound on the feeder of SH 290 and then entered the main lanes of SH 290.  Surveillance was maintained on the black GMC and it was followed to a residence located at 7430 Weatherhill, Houston, Texas.  The GMC parked in the home's driveway next to a green Ford Explorer, Texas license #X30-MFM.

13.  At approximately 1:25 p.m., two Hispanic females exited the home and got into the black GMC Denali and left the area.

14.  At approximately 4:38 p.m., DeLeon was seen emerging from the home carrying a large black duffel bag.  Agents observed him approach the green Ford Explorer that was still parked in the driveway and placed the bag in the left rear passenger area of the vehicle.  He then shut the door to the vehicle and got a rake that was leaning against the home and began raking the front yard.  At approximately 4:52 p.m., Escobar was seen emerging from the homes front door.  He was seen carrying two large black plastic trash bags that he cradled under his right arm and held at the top with his left hand.  As he was seen carrying the bags toward the Ford Explorer, DeLeon went to the Explorer to assist Escobar with the door to the Explorer so he could put the bags into the Explorer.  DeLeon then shut the door and continued raking leaves in the yard and Escobar was seen going back into the home.

15.  At approximately 4:53 p.m., Escobar returned to the front yard and walked to a white 4 door Honda Civic (paper plates) that was parked in the street in front of the home.  DeLeon followed him to the vehicle and they appeared to be looking in the engine compartment area of the vehicle.  As they were doing this, Escobar was seen using a cellular phone and appeared pre-occupied with the phone call.  At approximately 4:55 p.m., a Hispanic male, (later identified as Leonardo Arcemio Garcia) emerged from the homes front door.  He walked to the roadway and met with Escobar and DeLeon at the white Honda.  As Escobar spoke to Garcia, it appeared that Escobar handed Garcia a black cellular telephone.  The three talked briefly.  Garcia went back into the house while Escobar and DeLeon entered the Explorer.  The Explorer left the residence at approximately 4:58 p.m.

16.  Surveillance was maintained on the Explorer as it traveled to 8915 Alejo, Houston, Texas.  The vehicle arrived at 8915 Alejo at approximately 5:25 p.m.

17.  At approximately 5:43 p.m., Escobar and DeLeon were seen exiting 8915 Alejo, Houston, Texas.  Escobar opened the right rear passenger door of the Explorer and retrieved the two large black plastic bags from the passenger area.  DeLeon retrieved the large black duffel bag.  They went directly to the front door of the home and went inside.

5

18.  At approximately 6:37 p.m., Escobar was seen exiting the home and got into the Explorer.  Surveillance was maintained on the Explorer and it was followed to Bravos Mexican Restaurant.  Upon arrival, the gray Jeep that Hernandez was driving was already in the parking lot.  The Explorer parked next to the Jeep and the occupants spoke.

19.  At approximately 6:51 p.m., Hernandez, and two other Hispanic males (later identified as German Arias and Sugentino Percel) got into the Explorer with Escobar and they departed the restaurant parking lot.

20.  At approximately 7:03 p.m., surveillance followed the Explorer back to 8915 Alejo, Houston, Texas.

21.  Upon arriving back at 8915 Alejo, DEA Agents observed all three occupants exit the Explorer and go inside the home.  Agents advised that Arias and Percel were carrying medium sized black plastic bags (one each), as they entered the home.

22.  At approximately 8:36 p.m., Escobar again left the home located at 8915 Alejo, Houston, Texas and drove to an apartment complex located at 3737 Watonga.  Upon arrival at the apartment complex, Escobar did not enter the property.  He arrived and stopped in the 3700 block of Watonga where he was met by two Hispanic males that were waiting for him near the roadway.  The two males he picked up were later identified as **Jesus Osorio** and Eric Vasquez.  All three subjects left the area in the Explorer and traveled back to 8915 Alejo, Houston, Texas.  They arrived at approximately 9:15 p.m. and all three exited the Explorer and entered the home.

23.  At approximately 9:30 p.m., Escobar, **Osorio**, and Arias, left the home at 8915 Alejo and drove back to 3737 Watonga.  This time the Explorer entered the complex and drove to the northwest portion of the parking lot.  Surveillance was maintained on the vehicle and its three occupants.  **Osorio** and Vasquez exited the Explorer and got into a silver Dodge mini-van, Illinois License #D264919.  They started the vehicle and followed the Explorer that Escobar was driving.  Surveillance was maintained on both vehicles as they traveled in tandem back to 8915 Alejo, Houston, Texas.

24.  At approximately 9:57 p.m., the Explorer arrived back at 8915 Alejo, Houston, Texas, and this time Escobar did not park it in the driveway.  He parked the Explorer in the street in front of the home.  As he was parking the Explorer, the Dodge mini-van arrived and pulled into the driveway.  Someone from inside the home opened the garage door as the mini-van was pulling up to it.  The mini-van was seen pulling into the single car garage and the door was shut.  As the door

was being shut, the lights inside the garage were turned off.  As the door shut, Escobar was seen backing the Explorer into the driveway all the way to the garage door, nearly touching it.  Escobar then got out of the Explorer and went into the house by way of the front door.

25.  At approximately 11:05 p.m., Escobar exited the home and got into the Explorer and pulled out of the driveway and waited in the roadway. As he was doing so, the garage door opened and the Dodge mini-van backed out of the garage, down the driveway, and pulled behind the Explorer.  The two vehicles left the residence in tandem.

26.  At approximately 11:15 p.m., a Harris County Sheriff's Office Deputy stopped the mini-van for a traffic violation for an expired vehicle registration. Upon contacting the two occupants of the vehicle, (identified as German Arias (Driver) and **Jesus Osorio**).  The deputy obtained verbal consent to search the mini-van using his narcotics detecting K-9.  The deputy advised agents his K-9 gave a positive alert on the right rear exterior of the vehicle.  The deputy then conducted a search of the vehicle and was able to locate approximately 10 heat sealed clear plastic packages wrapped in green cellophane in the right rear quarter panel of the mini-van.

27.  Upon opening one of the ten packages found, it contained a compressed white powdery substance that tested positive for cocaine content using a Scott reagent test kit.  The packages were sealed in clear heat sealed plastic.  Inside the clear plastic was green cellophane that had been tightly wrapped around the contents. Under several layers of the green cellophane, there was a layer of axle grease, more cellophane and then the white compressed substance.

28.  Laboratory analysis revealed the total approximate net weight of the cocaine seized from the mini-van as **9.9 kilograms.**

29.  **Osorio** and Arias were kept separate from one another.  **Osorio** was then transported to the area of 3737 Watonga #16, Houston, Texas, where agents obtained a written consent to search **Osorio's** residence.

30.  A search of **Osorio's** residence, produced a small amount of marijuana in the kitchen cabinet along with a small digital scale containing white residue.  The residue was field tested and showed positive for the presence of cocaine.  **Osorio** stated the marijuana found was for personal use but would not reveal where he obtained it.

31.  As the traffic stop on the Dodge mini-van was being initiated, surveillance advised that the Explorer being driven by Escobar drove past the traffic stop and

u-turned.  The vehicle was followed as it made its way back to the area of 8915 Alejo, Houston, Texas.  The vehicle turned onto Alejo and instead of turning left to go to the house, it turned right and waited in the middle of the street approximately 55-65 yards away from the home.  Hernandez was seen briskly walking down the driveway of 8915 Alejo towards the waiting Explorer.  As Hernandez proceeded toward the Explorer, he was closely followed by Vasquez, Percel, and DeLeon.  Once all were in the vehicle, it sped away at a high rate of speed.  The Explorer eventually drove to the area of 3737 Watonga #16, Houston, Texas, where it was stopped by marked Houston Police Department (HPD) units.  HPD officers arrested Escobar, Hernandez, DeLeon, Percel and Vasquez without incident.

32.  Agents were conducting a federal search warrant at the home of Juan Antonio Escobar (with written consent by Escobar's wife, Izabela Danuto Jurczenko), 7430 Weatherhill, Houston, Texas, when surveillance advised them of the cocaine discovery in the mini-van.  A search of Escobar's home, where Leonardo Arcemio Garcia was found to be present, revealed eight (8) more kilogram sized bricks of cocaine, MDMA, cocaine base, $52,475 in U.S. currency, a Cabilondo y Ciavitoria .45 Caliber pistol, a Ruger 9mm pistol, a suspected drug ledger, various scales, cellophane, baggies and marijuana at the residence.  Agents discovered a 1997 white Dodge pickup truck in the garage with a hidden compartment built between the backseat and bed of the truck.  The eight kilograms of cocaine were located in the master bedroom closet and the two pistols were located in the master bedroom dressers.

33.  Laboratory analysis revealed the total approximate net weight of the illegal substances seized from Escobar's home as follows: 7.8 kilograms of cocaine, 13.6 grams of cocaine base, 7.7 grams of 3, 4 Methylenedioxymethamphetamine (MDMA) and 7.5 grams of marijuana.

34.  During the search of Escobar's home, agents learned that Escobar's wife, Izabela Danuto Jurczenko, owned the home located at 8915 Alejo, Houston, Texas.  She advised agents that nobody was presently living there and was willing to give written consent to search that home as well.

35.  On February 22, 2006, at approximately 3:08 a.m., Mrs. Jurczenko arrived at 8915 Alejo, Houston, Texas, and did give written consent to search the home.  The front door was found to be standing ajar.  Inside the home in a small bedroom located in the central portion of the home, agents discovered two black plastic trash bags that contained a total of twenty five (25) additional kilogram sized bricks of cocaine.  The bricks were packaged identically to those located in the mini-van.  Upon opening one of them, agents found that the packages contained a compressed white powdery substance which tested positive for cocaine content

using a Scott reagent test kit.  There were ten (10) bricks located in one bag and fifteen (15) brick located in the other.  Inside the kitchen area of the home, agents found a vacuum seal machine and latex gloves that had been worn and had axle grease all over them.  There were also unused latex gloves, green cellophane and paper towels with smeared grease all over them.  In the living room area, agents located a large black duffel bag Deleon had previously been seen carrying to the Explorer and then into the home.  Inside the bag, agents located a large electronic money counter.

36.  Laboratory analysis revealed the total approximate net weight of the cocaine seized from 8915 Alejo, Houston, Texas, as **24.9 kilograms**.

Relevant Conduct Assessment

37.  **Jesus Alejandro Osorio** is held accountable for the sale and negotiation of a total of 34.8 kilograms of cocaine from DeLeon, Escobar and Garcia.  The total of 34.8 kilograms of cocaine is derived from the 9.9 kilograms of cocaine seized in the minivan driven by **Osorio** and Arias and the 24.9 kilograms of cocaine seized from the 8915 Alejo, Houston, Texas.  **Osorio** is seen to have neither an aggravating or mitigation role in the drug conspiracy.  (emphasis in original)

Pursuant to the PSR, Osorio's advisory guideline sentencing range was calculated as follows:  (1) Osorio had a base offense level of 34 under U.S.S.G. § 2D1.1(c)(3).   (2).  With a total offense level of 34, and with a criminal history category of I, Osorio had an advisory guideline sentence range 151 to 188 months. On May 25, 2007, Osorio was sentenced to a term of imprisonment of 151 months, and a 5 year term of supervised release, and a $200 special assessment.  (Document No.  342, Transcript of Sentencing Hearing, Document No.  391, pp.  10-11).  Judgment was entered on May 31, 2007.  (Document No.  343).  With respect to Osorio's sentence, Judge Harmon stated:

All right.  Mr.  Osorio is a 44-year old nationalized citizen originally from Mexico and is being sentenced this morning for his involvement in the multi-kilogram trafficking conspiracy for which he was arrested in Houston.

He was convicted after he went to trial, and this is his first contact with the criminal justice system.  The offense conduct details extensive drug involvement

9

on the part of the defendant to the detriment of communities and persons within those communities.  Based on his lack of criminal history and his cooperation, a sentence at the low end of the guideline range, that would be 151 months is, I believe, an appropriate sentence.

It adequately sanctions the seriousness of the offense, reflects the defendant's background, characteristics, including drug recidivism for just punishment deterrence and public protection.

I believe that the sentence is sufficient, reasonable and necessary, in light of the factors and purposes comprising and underlying 18, United States Code, Section 3553(a).  (Transcript of Sentencing Hearing, Document No.  391, pp.  9-10).

Osorio appealed his conviction to the Fifth Circuit Court of Appeals.  (Document No. 349).  On appeal, Osorio argued (1) that the district court should not have permitted extrinsic evidence detailing a previous drug transaction; (2) the prosecutor asked questions in cross-examination of a defense witness that improperly assumed Osorio's guilt; and (3) the district court erred in refusing to provide a requested jury instruction regarding character evidence.  The Fifth Circuit, unpersuaded by all the arguments raised by Osorio, on August 15, 2008, affirmed the conviction.  *United States v.  Osorio*, 288 Fed.  Appx.  971, 2008 WL 3821319 (5th Cir. August 15, 2008).  Osorio filed a petition for writ of certiorari with the United States Supreme Court, which was denied on December 15, 2008.  *Osorio v.  United States*, 129 S.Ct.  771 (2008).  As such, Osorio's judgment and conviction became final on December 15, 2008.

The docket sheet reveals that Osorio's § 2255 motion was received and filed on December 17, 2009. (Document No.  480).  Osorio's Certificate of Service does not provide a date upon which service was made.  Osorio signed his § 2255 Motion on December 11, 2009, and the Declaration in Support on November 12, 2009.  The prison stamp on the envelope in which the § 2255 Motion was mailed as well as the postal service mailing stamp show the same

10

date:  December 16, 2009.  The Government, using December 16, 2009, as the date of mailing, argues that Osorio's § 2255 Motion is untimely because it was not filed on or before December 15, 2009.  According to the Government, Osorio delivered his § 2255 Motion into the prison mail system on December 16, 2009, and therefore, his § 2255 Motion is untimely by one day.

Upon this record, the Government has not shown that December 16, 2009, was the date that Osorio *delivered* his § 2255 motion into the prison mail system.  There is a stamp on the envelope mailed to the Court that indicates that on December 16, 2009, "the enclosed letter was processed through special mailing procedures for forwarding to you.  The letter has neither been opened nor inspected.   If the writer raises a question or problem over which this facility has justification, you may wish to return the material for further information or clarification...." (Document No.  480, p.  11). While the Government has established the date of mailing of Osorio's § 2255 motion *from* the prison as December 16, 2009, it is unclear if this was the date that Osorio *delivered* it into the prison mailing system for purposes of the mailbox rule, especially given that Osorio signed the§ 2255 Motion on December 11, 2009, which was within the one year filing deadline.  In addition, the Government has provided no further documentation that shows that being processed through special prison mailing procedures is the same as being delivered into the prison mailing system.  Upon this record, because it conclusively cannot be shown that Osorio's § 2255 Motion is untimely, the Government's Motion to Dismiss as time-barred should be denied.

Osorio, in his § 2255 motion, Declaration and later filed Memorandum in Support of § 2255, identifies several grounds:

Ground 1: "Brady/Jencks Material, Surveilance [sic]"

Ground 2: "Ineffective Assistance of Counsel/Conspiracy"

Ground 3: "Traffic Stop"

Ground 4: "Canine Dog Alertness [sic]"

Ground 5: "Arrest, Aiding, and Abetting"

Ground 6: "Witness's [sic] Statements"

Ground 7: "Petitioner's Involvement"

Ground 8: "Evidence Seized at Petitioner's Residence"

Ground 9: Ineffective Assistance of Counsel, James Hearing (Co-Conspirator Statement

Ground 10: Ineffective Assistance of Counsel, Prior Drug Transaction

This § 2255 proceeding is ripe for ruling.


## II. Discussion

### A.  Sufficiency of the Evidence

Notwithstanding Osorio's characterization of his numerous grounds for review, the

overall gist of his § 2255 Motion, and Memorandum in Support, is that he should not have been

found guilty of the charged offenses because he was not involved in the drug trade.  Indeed, as

Osorio writes in his Declaration in Support of Section 2255:

> Foremost, I have never, ever been involved in any type of drug trade/conspiracy in
> my life.  I have always been a hard working male that valued my freedom to all
> extinct [sic] ...period.  I do admit that in this world anyone can "know" a person
> involved in drugs, but that does not make me guilty of dealing of drugs.  There is
> nothing to link me to a conspiracy to distribute drugs.  The honest facts are that I
> was at work while all this surveillance of my apartment was being carried out, and
> there has never been proved that the government had probable cause to arrest me
> or charge me for a crime I never participated in and all of the videos never seen

me moving from place to place, carrying plastic bags or the government's witnesses never stated I was involved in the conspiracy.  I was just a passenger in a vehicle that, supposedly, had cocaine hidden from sight behind a wall panel that had to result by tools to hide or retrieve the cocaine.  Even D.E.A. Agent Cornelius stated on the stand that "No, no one could either see or smell the cocaine".  I would never had accepted a ride back to my apartment "if" I knew the cocaine was in that vehicle.  Furthermore, after being stopped by the Houston Police Department and cuffed and put in the back of a police car, arrested, the police drove the vehicle around a corner out of eyesight and "then" searched the vehicle and came back to me and told me "did you know the cocaine was hidden in the vehicle?"  Of course I stated "no" and told the police they could search my apartment because I did not have cocaine in my apartment.  I believe the chain of custody was violated when the Police moved the vehicle from the traffic stop and neither I or the driver could see where the vehicle was taken to.

The only evidence contributed to me is the false statements from the two admitted, cocaine consuming, co-defendants to felony possession of cocaine to distribute the drug(s) and they were only testifying to get a lower sentence and should not be admissible, I believe.

I also did not have the financially or personally involvement in, what the government stated, four and a half million dollars worth of cocaine; I was at work making ten (10) dollars an hour, something I considered important to me because I did not want to lose my freedom or for always looking over my shoulders wondering when I would be arrested.

I respectfully request to have any sentence vacated.  (Document No.  481)

According to Osorio, "he was a happy man enjoying life as a meager wage earner."  (Document No.  487, p.  5).

Osorio is not entitled to relief on his sufficiency of the evidence claim because such claims are not cognizable under § 2255.  *United States v.  Forrester*, 456 F.2d 905, 907 (5th Cir. 1972); *United States v.  Garcia*, 68 F.3d 466 (5th Cir.  1995).   Furthermore, to the extent that Osorio contends that his attorney rendered ineffective assistance of counsel at trial because there was no evidence linking him to the drug trafficking activities, Osorio has not shown, upon this record that his attorney's performance fell below that of *Strickland*.

Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had.  *Strickland*, 466 U.S. at 687.  Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable.  *Id*. at 687-88.  The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable.  *Id*. at 694-95.  Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief.  The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong.  *United States v. Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy."  *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*).  To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different.  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record.  Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense.  *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984).  The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct.  *Strickland,* 466 U.S. at 690.  "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices."  *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)).  Conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition.  *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

Other than Osorio's conclusional statements that there was no evidence to link him to the drug trafficking activities in question, he cites to no specific allegations of actions that counsel could have and should have taken that could have resulted in a different outcome.  To the extent that Osorio alleges that counsel was inadequate in failing to obtain full discovery, Osorio does not identify the discovery that counsel could have and should have obtained.  The record shows that counsel filed discovery motions, including a request for all exculpatory information, a Motion to Sever, and a Motion to Suppress.  (Document Nos.  50, 51, 53, 136).  Moreover, in connection with the Motion to Suppress, counsel presented many of the arguments in favor of

suppression that Osorio now claims that counsel failed to make.

Osorio also alleges that counsel was ineffective because he failed to secure a *Kastigar* hearing.  In *Kastigar v.  United States*, 406 U.S. 441 (1972), the Supreme Court upheld the constitutionality of 18 U.S.C. § 6002, which grants use and derivative use immunity to federal witnesses.  The Court held that the use and derivative-use protection is "coextensive with the [Fifth Amendment] privilege ... and is all that the Constitution requires."  *Id.*  at *459.*  Here, the Government did not present immunized testimony against Osorio.  As such, Osorio's reliance on *Kastigar* is misplaced. Because the Government did not use immunized statements against him, Osorio has not and cannot show that counsel erred by not requesting a *Kastigar* hearing.

Finally, Osorio claims that counsel was constitutionally ineffective because he failed to request a "*James* hearing."  A *James* hearing, refers to *United States v.  James,* 576 F.2d 1121 (5th Cir.  1978), which requires a court to hold a pretrial hearing to determine the existence of a conspiracy and a connection to each defendant as a prerequisite to the admissibility of co-conspirator statements.  The record shows that the government did not offer statements that had been given by any of the co-defendants.  Rather, the record shows that two of Osorio's co-defendant's testified at the trial and were subject to cross-examination.  Because no such statements were used, there was no legal basis for counsel to have requested a *James* hearing.

Osorio appears to suggest that counsel was ineffective for not objecting to the government's use of perjured testimony.  He does not, however, identify the government witness whose testimony was false or the nature of the perjured testimony.  Unsupported and conclusory allegations are not sufficient to support a claim of ineffective assistance of counsel.  The record shows that two of Osorio's co-defendants, Baldoramo DeLeon and German Arias, testified at

trial pursuant to agreements with the Government, and that another co-defendant, Sugentino Percel, opted to testify on his own behalf.  The record shows that Osorio's counsel cross-examined each of these witnesses, and with respect to Arias and DeLeon, questioned them about their motivation to testify, namely, a possible sentence reduction.  The jury was instructed about assessing witness credibility.

In his Motion to Supplement Evidence, Osorio has submitted the Declaration of German Arias.  The Declaration is in Spanish.  According to Osorio, Arias has had a change of heart and will now testify truthfully about the Government's plan to "convict Movant and his co-defendants."  (Document No.  503, p.  2).  Osorio argues that the new evidence entitles him to a hearing or new trial.

Affidavits from witnesses who attempt to recant testimony are viewed with "extreme suspicion."  *Summers v.  Dretke*, 431 F.3d 861, 872 (5th Cir.  2005).  "New trials based on newly discovered evidence are generally disfavored by the Courts and are viewed with great caution."  *United States v.  Nixon,* 881 F.2d 1305, 1311 (5th Cir.  1989).  A new trial based on recanted testimony is warranted only when (1) such evidence is discovered after trial, (2) the failure to learn of the new evidence was not caused by movant's lack of due diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material, and (5) a new trial would probably produce a new result.  Here, some four years after trial, Osorio relies on the statement of Arias.  Even assuming that Osorio could overcome the four year delay in coming forward with the statement, has not and cannot show that the outcome of the trial would be different.  To the extent that he suggests that German Arias' new statement shows that his trial testimony was false, the record shows that counsel thoroughly cross examined Arias.  Moreover, the statement

does not address Arias' testimony about earlier dealings with Osorio.  Counsel objected to Arias'

testimony about a similar cocaine transaction that had occurred in December 2005 or January

2006.  Counsel raised this issue on appeal.  The Fifth Circuit considered the admission of Arias'

testimony about the earlier cocaine transaction and concluded that the court had not erred in its

admission.  The Fifth Circuit wrote:

> Certainly, Arias' testimony did not provide dispositive evidence that Osorio had
> brokered the prior drug deal.  The sum of the extrinsic evidence was that in late
> December or early January of 2005, Osorio was present during the sixty to ninety
> minutes when four of his co-defendants (including a total stranger) packaged and
> removed thirty-three pounds of cocaine from his apartment.  Although this is a
> close question, we do not find that the trial judge abused her discretion in
> determining that a reasonable jury could conclude that, more likely than not,
> Osorio committed the prior bad act.  The jury is permitted to consider the totality
> of evidence and apply common sense.  Here, the jury could have concluded that
> an individual is usually aware of, and involved in, a sixty to ninety minute
> transaction occurring in their own home, which included a total stranger, that
> results in the packaging and removal of thirty-three pounds of cocaine.  When
> considered in light of Deleon's testimony that Osorio took a largely passive role
> when he brokered the later narcotics deal from his home and other evidence that
> Osorio's role in the conspiracy was as a broker between the sellers and out-of-
> town buyers, the connection between Osorio and the earlier transaction does not
> appear so weak as to bar a reasonable jury from concluding that, more likely than
> not, he committed the prior bad act.  Accordingly, we find that the extrinsic
> evidence was sufficiently established and relevant to the issue of Osorio's
> knowledge and intent.
>
> *                              *
>
> Little evidence existed to tie Osorio to the charged conspiracy independent of his
> co-conspirators' testimony, which was challenged as suspect.  Indeed, Osorio's
> defense was that there was not direct evidence of his guilt, because he arrived at
> Escobar's residence after the cocaine had been packaged, spent his time in the
> house talking and watching television, and was not near the van other than when
> he got into and out of it.  That his visiting co-defendants (including a complete
> stranger) were alleged to have conducted a lengthy transaction which resulted in
> the packaging and transport of over thirty pounds of cocaine from his apartment a
> few months earlier is probative of his participation in the conspiracy and would
> support the testimony of DeLeon, a cooperating defendant.  Certainly, the

extrinsic evidence was probative as to the role of each conspirator, the modus operandi of the conspiracy, the introduction of Arias into the conspiracy, and the intent of the two individuals standing trial with Osorio, both of whom actively participated in the earlier transaction.

Overall, the trial transcripts show that counsel thoroughly cross examined each government witness such as DEA Agent Cornelius, Derek Sanders, chemist/toxicologist with the City of Pasadena Police Department, Claudia Busby, forensic chemist with the City of Pasadena, Co-Defendant Baldomero DeLeon, Officer Kelly with the Pasadena Police Department, Co-Defendant German Rafael Arias, Detective James Wright with the Pasadena Police Department, Co-Defendant Sugentino Percel, and Rosanna Peralta, the girl friend of Co-Defendant Vasquez. In addition, he called to testify on Osorio's behalf, Robert Bosley, the owner of the printing company that employed Osorio.  Mr.  Bosley testified that he had known Osorio for twelve years, and that he employed Osorio has a salaried, full time employee.  (Tr.  581-583).  According to Mr.  Bosley, Osorio worked on February 21, 2006, from eight to five.  (Tr.  586). On cross-examination, Mr.  Bosley testified that he did not monitor cell phone use by his employees and could not state that Osorio did not place numerous phone calls on that date.  (Tr. 587-588).   In sum, there was testimony from DEA Agents who conducted surveillance, there were video tapes made during the surveillance, the items found during the search of the vehicles and residences, and the testimony of participants in the drug activities that implicated Osorio in the offense.

To the extent that Osorio suggests that two co-defendants made statements on promises of leniency and therefore were biased and not credible, the record shows that counsel questioned the testifying co-defendants (German Arias and Baldorama DeLeon) about their respective pleas and the impact testifying would have on their sentencing exposure.  (Document No.  209, pp.

283, 400-403).

Next, Osorio raises several Fourth Amendment grounds for review.  For example, he alleges that his right to privacy under the Fourth Amendment was violated by law enforcement surveillance, and he also challenges the traffic stop.  Osorio argues that since no traffic ticket was issued, there was no probable cause or suspicion to stop the van.  According to Osorio, he did not know drugs were hidden in the van when he was arrested.  Osorio also asserts that when the police moved the van out of the street, it broke the chain of custody responsibility and he did not witness the police canine alert to the cocaine.  He further claims, in support of his innocence, that he gave consent to search his apartment.

Here, the record shows that all of the above claims were addressed at a suppression hearing.  Osorio had a full and fair opportunity to litigate his Fourth Amendment claim in pre-trial proceedings.  Accordingly, all of Osorio's Fourth Amendment claims may not be raised on collateral review as those claims are barred by *Stone v.  Powell*, 428 U.S. 465 (1976).  *See also United States v.  Cavitt*, 550 F.3d 430, 435 (5th Cir.  2008); *United States* v.  Ishmael*, 343 F.3d 741 (5th Cir.  2003)*.

### III.  Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED that the Government's Motion to Dismiss (Document No.  504) be GRANTED, and that Movant Jesus Alejandro Osorio's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No.  480) be DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented

parties of record.  Within 14 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed. R. Civ. P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the 14 day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 24th  day of February, 2011.


Frances H. Stacy
United States Magistrate Judge